UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANTHONY SMITH,

    Plaintiff,

    v.      CAUSE NO. 3:23-CV-296-DRL-MGG

JOHN GALIPEAU,

    Defendant.

OPINION AND ORDER

Anthony Smith, a prisoner without a lawyer, filed a complaint that the court construed as a preliminary injunction motion concerning his medical care at Westville Correctional Facility for a seizure disorder. The court ordered "Warden John Galipeau to file and serve a response to the motion for a preliminary injunction . . . (with supporting medical documentation and declarations from other staff as necessary) describing/explaining how he is providing Anthony Smith with constitutionally adequate medical care for his seizures[.]" ECF 5. The Warden filed a response. Mr. Smith did not file a reply, and the time to do so has passed. ECF 11. The motion is ready to be decided.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As to the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). A "mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotations omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true, nor do[es] [it] give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must assess the merits as "they are likely to be decided after more complete discovery and litigation." *Id.* at 792. The first step is "often decisive," and the court need not analyze the remaining elements then. *Id.* at 791. On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

"Mandatory preliminary injunctions" requiring the defendant to take affirmative acts—such as transferring an inmate or providing him with additional medications—are viewed with particular caution and are "sparingly issued[.]" *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotations omitted). Additionally, in the prison context, the court's ability to grant injunctive relief is significantly circumscribed; any remedial injunctive relief "must be narrowly drawn, extend no further than necessary to remedy the

2

constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citations and quotations omitted).

The allegations in the preliminary injunction motion were summarized in the court's screening order:

> Mr. Smith complains about the lack of treatment he is receiving at Westville Correctional Facility for his frequent seizures. He alleges that since March 2019, he has had 42 seizures a month and they have been increasing in frequency, but he still does not have a diagnosis about what is causing the seizures. He alleges that he has fallen out in the dorm several times and awoken to find food on his face and bruises on his body, but no medical staff were called to examine him.
>
> Mr. Smith alleges that at the end of August 2019, he wrote the Ombudsman Bureau about his medical issues. He says they contacted Wexford, the prison's medical provider at the time, to discuss his medical treatment, which consisted of the medication Depakote. But even after that, Mr. Smith says his care did not improve. He says an outside doctor, Dr. Abdulkarim Sharba, ordered a yearly MRI scan, but Wexford did not provide that treatment. When Centurion Health replaced Wexford as the prison's medical provider, Mr. Smith claims his care did not change. He contends that he still is not getting proper treatment and the frequency of his seizures is increasing. He asks the court to order defendants to "fix [his] health problems" and to pay damages for his pain and suffering.

ECF 5 at 1-2.

In response, the Warden provides excerpts of the more than 1200 pages of medical records from 2019, when Mr. Smith was transferred to Westville Correctional Facility, through April 2023, just before the response was filed. These medical records show that Mr. Smith began having seizures in 2013, which led to the discovery of a meningioma (a brain tumor). ECF 11-14 at 2. In 2013, the meningioma measured at 11mm, and repeat MRIs in 2014, 2016, and 2018 showed no growth. *Id.*

The medical records show that on October 25, 2019, Mr. Smith was examined by a nurse after a Signal 3000 was called for a possible seizure. ECF 11-6 at 1. At the time, Mr. Smith was taking an anti-seizure medication (Keppra) and valproic acid (Depakote). *Id.* at 2. The doctor increased his dosage of Keppra and had Mr. Smith admitted to the infirmary for observation. *Id.* at 2-3, 7-8.

While in the infirmary, the next observed seizure occurred a week later, on November 1, 2019. ECF 11-7 at 1. It was described as being "more like a staring episode," as Mr. Smith was "expressionless and not answering when asked a question." *Id.* He was discharged from the infirmary on November 13, 2019. ECF 11-8. In the two and a half weeks in the infirmary, only one seizure was observed, which was a decrease from the 2-3 seizures he had been reporting previously. *Id.* at 1. Mr. Smith told the nurse that he had other episodes while in the infirmary, but this was the only one reported to the nurses. ECF 11-7 at 1. He was continued on the increased dosage of Keppra, and the doctor suspected that Mr. Smith might be having pseudoseizures. ECF 11-8 at 1.

Mr. Smith followed up with the doctor a week later. ECF 11-9. In the intervening week, a Signal 3000 was called for a seizure on November 15, 2019, described as a "brief staring spell w/o any tonic clonic motions nor any bowel incontinence or tongue biting w/this very transient episode." *Id.* at 1. By the time the nurse responded to the signal, Mr. Smith was walking around and able to respond to her. *Id.* The doctor noted that the frequency of the seizures had decreased from 2-3 a week, and he again noted the possibility of pseudoseizures. *Id.*

At a Chronic Care Visit on July 20, 2019, the doctor noted that the medication levels in Mr. Smith's system were checked and were within normal limits. ECF 11-10 at 1. In addition, after a recent seizure, a nurse had drawn blood to check his prolactin levels to help determine the cause of the seizures.[1] *Id.* Mr. Smith's prolactin levels were found to be within normal limits. *Id.* The doctor again suspected pseudoseizures and educated Mr. Smith about them, explaining that "pseudoseizures does not mean faking, but just that the seizure like activity does not match up with [abnormal] brain activity, and that stress can be a factor." *Id.*

The medical records document one other possible seizure a year later, on July 21, 2020, but nothing again for the next several months. ECF 11-11 at 1-2. On February 23, 2021, Mr. Smith saw a nurse in response to several healthcare requests he submitted complaining about having seizures with no signal being called. ECF 11-13 at 1-2. The nurse noted in the visit summary that none of the custody staff had witnessed the seizures; only other offenders had seen them. *Id.* at 2. When custody staff responded to a reported seizure, Mr. Smith no longer showed signs of seizure activity. *Id.*

In May 2021, the doctor requested a repeat MRI because three years had passed since the last one. ECF 11-14 at 2. He consulted Uptodate, a database that compiles medical research and best practices to be a used resource when making treatment

---

[1] According to the American Academy of Neurology, the level of prolactin in the blood increases after a generalized tonic-clonic seizure or a complex partial seizure, so a blood test within 10-20 minutes after a seizure can help diagnose or rule out a type of seizure. Am. Acad. of Neurology, *New Guideline: Blood Test Can Help Determine Type of Seizure*, Sept. 12, 2005 Press Release, https://www.aan.com/PressRoom/home/PressRelease/316#:~:text=The%20blood%20test%2C%20which%20must,these%20types%20of%20seizures%20occur (last visited Aug. 25, 2023).

decisions. *See* Wolters Kluwer, UpToDate: Industry-leading clinical decision support, https://www.wolterskluwer.com/en/solutions/uptodate (last visited Aug. 25, 2023). The doctor noted that UpToDate "considers asymptomatic meningiomas to be under 20mm (again pt's is 11mm). At this point in time, uptodate suggests repeat imaging every 2-3 years." ECF 11-14 at 2. The repeat MRI happened on August 3, 2021, and showed no increase in the size of the meningioma. ECF 11-15 at 1-2.

The medical record then jumps several months to April 15, 2022, when medical staff responded to a Signal 3000 for a potential seizure. ECF 11-17 at 1-2. When the nurse arrived, Mr. Smith was sitting on a bed, eating cookies and talking with custody staff. *Id.* at 2. She noted he was alert and oriented, she did not see any seizure-like activity, there was no incontinence, and he was not postictal. *Id.* After this point, Mr. Smith's seizures seem to increase in frequency, with signals called for suspected seizures on April 25, 2022 and July 10, 2022. ECF 11-18 at 1-3; ECF 11-19 at 1-2. He was seen in medical on August 20, 2022, in response to healthcare requests he submitted about the increasing frequency of his seizures, and he was seen by medical staff on September 8, September 16, November 12, and November 16, 2022, for seizure activity. ECF 11-21 at 1-2; ECF 11-22 at 1-3; ECF 11-23 at 1-2; ECF 11-24 at 1-2; ECF 11-25 at 1-3.

At a chronic care visit on November 16, 2022, the doctor noted the increased seizure activity. ECF 11-25 at 1-8. In response, he ordered a blood test to determine the level of medication in Mr. Smith's system and considered increasing the dosage of the medication. *Id.* at 4-5, 8.

6

Additional seizures were noted on December 15, 2022 and December 28, 2022—this one resulting in injuries to Mr. Smith's eyebrow and shoulder (which x-rays showed was not broken). ECF 11-26 at 1-2; ECF 11-27 at 1-3, 5. Another Signal 3000 was called on February 3, 2023, after an officer saw Mr. Smith sitting on a bottom bunk, just staring. ECF 11-28 at 1-4. The nurse noted that he did not come for his morning medication that day. *Id.* at 3. On February 22, 2023, he was examined by a nurse after he had a seizure and fell backwards, bruising his head. ECF 11-29 at 1-4. The nurse noted that he had missed two days of medication. *Id.* at 3. An x-ray of his skull showed no fractures. ECF 11-30.

Mr. Smith saw the doctor on March 1, 2023, because of the increased frequency of his seizures. ECF 11-31 at 1-5. The doctor ordered blood tests to determine the levels of medication in Mr. Smith's system and stated that he would obtain a repeat MRI to determine whether the meningioma might have changed and could be causing the increased frequency of the seizures. *Id.* at 4.

On March 13, 2023, another Signal 3000 was called for a focal seizure. ECF 11-32 at 1-3. When the nurse responded, she found Mr. Smith sitting upright in a wheelchair, awake but nonverbal with postictal symptoms but no incontinence. *Id.* at 3. He was taken to urgent care, where he remained until he recovered and was cleared to return to his dorm. *Id.*

Mr. Smith was scheduled for a medical appointment on March 27, 2023, but he did not go. ECF 11-33. The next day, a Signal 3000 was called after an officer found him sitting on a bottom bunk, just staring and not talking. ECF 11-34 at 1-4. Mr. Smith did not attend the next scheduled appointments on March 29, March 30, and April 4, 2023. ECF 11-35;

7

ECF 11-36; ECF 11-37. Mr. Smith saw the doctor on April 5, 2023. ECF 11-38 at 1-3. At the visit, the doctor reviewed the results of the blood tests and decreased the dosages of Mr. Smith's medication after finding that the levels of medication in his system were high. ECF 11-38 at 1. No mention was made of a repeat MRI, but it was noted that Mr. Smith was not due for a repeat brain CT until 2024. *Id.* The medical records do not go past this point, and Mr. Smith did not provide information about the status of his seizures after this decrease in medication.

Under the Eighth Amendment, inmates are entitled to adequate medical care for serious medical conditions. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). They are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

Nevertheless, "mere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and quotations omitted). Instead, the court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotations omitted).

Additionally, it is not enough that a medical professional be mistaken in his or her judgment, as "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425-26 (7th Cir. 2020). Put another way, the plaintiff must show that a medical provider's treatment decisions were "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). On an injunctive relief claim, a court looks at whether there is "an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quotations omitted). In this case, that means the court looks at the current state of Mr. Smith's medical care.

Here, Mr. Smith has not shown he has a likelihood of success on the merits of his claim that he is currently receiving inadequate medical care for his seizures. His seizures qualify as a serious medical need, but the record does not support a finding that he is not receiving constitutionally adequate medical care. Instead, the record shows that when medical staff are called in response to a potential seizure, they assess him and treat any injuries. In addition, doctors monitor Mr. Smith's condition and adjust his medication as they deem necessary. His disagreement with the pseudoseizure diagnosis does not establish an Eighth Amendment violation.

Furthermore, the concerning increase in the frequency and severity of the seizures is being addressed. The record shows that the doctor is aware of the issue and is taking steps to determine a proper course of treatment. As of April 2023, the doctor decreased Mr. Smith's medication after tests revealed that his dosages were too high, and there is

9

nothing in the record to suggest that the doctor's treatment approach is blatantly inappropriate.

In addition, based on the Warden's response, it seems that the underlying claim for injunctive relief cannot succeed. Mr. Smith is proceeding "against the Warden of Westville Correctional Facility in his official capacity for injunctive relief to receive constitutionally adequate medical care for his seizures as required by the Eighth Amendment[.]" ECF 5 at 6. But the record before the court suggests that Mr. Smith is being provided with adequate care.

Federal Rule of Civil Procedure 56(f) allows the court to grant summary judgment for a nonmovant "after giving notice and a reasonable time to respond." Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court, therefore, will give Mr. Smith time to provide affidavits or other evidence to dispute the facts laid out in this order, which suggest that he is currently being provided with constitutionally adequate medical care.

For these reasons, the court:

(1) DENIES the preliminary injunction motion (ECF 6); and

(2) PROVIDES notice under Fed. R. Civ. P. 56(f) that if Mr. Smith does not file a response as described in this order by **September 29, 2023**, the court will grant summary

judgment in favor of the Warden on the claim for injunctive relief and this case will be over.

SO ORDERED.

August 28, 2023

*s/ Damon R. Leichty*
Judge, United States District Court